United States District Court
Southern District of Texas
**ENTERED**
September 30, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALYSSA WADE, *Plaintiff*, | § § § § | |
| v. | § § § | Civil Action No. 4:17-CV-1040 |
| MONTGOMERY COUNTY, TEXAS, *Defendant*. | § § § § | |

## MEMORANDUM AND RECOMMENDATION

This civil rights case is before the Court on the parties' cross-motions for summary judgment. Dkts. 50, 54.[1] Having considered the parties' submissions (Dkts. 50, 54, 59, 60, 62, 64, 66), the law, and argument of counsel at a hearing on the record on September 4, 2019, the Court recommends Defendant's motion be denied in part and granted in part, Plaintiff's motion be denied, and this case proceed to trial on Plaintiff's surviving claims.

### I.      Background

On April 8, 2015 Montgomery County police arrested Plaintiff for probation violations related to charges for possession of a controlled substance. Dkt. 54-2 at 18. At the time of her arrest, Plaintiff informed jail staff that she was under the care of a physician and was on numerous prescription medications for mental health conditions. Dkt. 54-2 at 15-16. At intake, jail staff classified Plaintiff as a medium risk for suicide. Dkt. 54-2 at 47. After intake, Plaintiff was placed in the general population for a very short period of time, and then moved to a "violent cell" for another very short period of time. Dkt. 66-1 at 2-8. A "violent cell" is a small cell with rubberized floors, walls, and door, "which lessens the likelihood of someone being able to injur[e] themselves by hitting, kicking,

---

[1] The District Court referred this matter to this Magistrate Judge for report and recommendation. Dkt. 28.

head biting [sic] the walls or the door." Dkt. 54-2 at 66.  Also, a "violent cell" has a drain in the floor that functions as a toilet.  *Id.*  On April 10, 2019, Plaintiff was moved from the "violent cell" to a 24-hour observation cell in the female booking area.  A "24-hour cell" is a single person cell designed to separate an inmate from other inmates.  It is monitored both by a closed-circuit TV and face-to-face rounds by guards.  Dkt. 54-2 at 64.  The 24-hour cell in which Plaintiff was housed contained a shower, sink, toilet, and desk.  *Id.* at 66; Dkt. 54-4 at 160.  At the time of Plaintiff's suicide attempt, 24-hour cells, including the one in which she was housed, also contained regular bed sheets and bunks with fixed handles.  *Id.* at 68, 82.

On April 10, 2015, a contract clinician with Tri-County Mental Health Services, John Jay Conley, evaluated Plaintiff.  Conley, who is not a doctor, recommended that Plaintiff be moved to the infirmary as soon as possible and that she remain in the 24-hour cell under suicide precautions until transferred to the infirmary.  Dkt. 54-2 at 86.  Conley's notes indicate that Plaintiff requested to stay in a 24-hour cell until she could start taking her medications.  Dkt. 54-2 at 86.  On April 12, 2015, Plaintiff refused meals and was banging on her cell and yelling for medications.  Dkt. 54-2 at 88, 90.  On April 13, 2015, Plaintiff attempted suicide in the 24-hour cell by wrapping a bed sheet around her neck and securing it to a handle on a bunk bed.  Dkt. 54-2 at 88.  During the suicide attempt, Plaintiff fell and hit her head.  *See* Dkt. 50 at 13; P.Ex. A (video).  Jail staff took Plaintiff, who was bleeding from her mouth, nose, and chin, to the infirmary.  Dr. Ahmed, a physician employed by Correctional Healthcare Companies, Inc. (CHC) examined her and told staff to call 911 for transport to Conroe Regional Medical Center.  Dkt. 54-2 at 244.

As a result of her suicide attempt, Plaintiff suffered a broken jaw which required surgery.  She was hospitalized following the incident for almost two weeks.  Dkt. 54-3 at 16-17.  Hospital records dated April 23, 2015 indicate "there will be a followup setup with Dr. Jason Bailey in 4 to 6 weeks."  Dkt. 54-3 at 16-17.  After return to the Montgomery County Jail on April 20, Dr. Ahmed wrote an order approving psychiatric and pain medications for Plaintiff.  Dkt. 66-1 at 21-32, 26.  On April 24, 2015, Conley evaluated Plaintiff and recommended she remain in the infirmary with monitoring until medically cleared, then placed in a 24-hour cell with monitoring.  Dkt. 54-3 at 34.  Plaintiff had a psychiatric consult on April 30, 2015 and psychiatric medications were continued.  Dkt. 66-1 at 40-41.  Jail records reflect that jail staff called Dr. Bailey on May 26, 2015 to inquire about an appointment for Plaintiff, who was due to have the wires removed from her mouth the week of June 8, 2015, but no appointment was set at that time.  Dkt. 54-3 at 36.  Plaintiff stayed in the jail's medical unit until June 5, 2015 when she was placed in the general population with no medical restrictions.  Dkt. 66-1 at 47.

During July 2015, Plaintiff repeatedly filed grievances and complained about complications from the wires in her mouth, the delay in having the wires removed, and her need for medications.  *See* Dkt. 54-3 at 45-55.  The Hospital District Health Care Program notified Plaintiff on May 20, 2015 that she was ineligible for medical services because "No Medical Need – Not a Covered Service."  Dkt. 66-1 at 45.  It is unclear whether the notice refers to her need to have the wires removed from her jaw or some other medical service.  Plaintiff finally was admitted to Conroe Regional Hospital for surgery to remove the wires from her mouth on August 5, 2015, the day prior to her release from jail.  Dkt. 54-3 at 98;

Dkt. 66-1 at 67.

Plaintiff filed this lawsuit against Defendant Montgomery County on April 5, 2017. Plaintiff's Second Amended Complaint asserts causes of action against the County under 42 U.S.C. § 1983 for violation of her rights to receive adequate medical care and to be protected from suicidal actions, and for violation of her rights under the Americans with Disabilities Act and § 504 of the Rehabilitation Act.  The most succinct statement of the factual bases for Plaintiff's claims is contained in her Summary Judgment Response:

> Ms. Wade was denied her mental health medications, placed in a solitary cell without a toilet for two days, and then moved to another solitary cell with a bedsheet and tie-down point. After she attempted suicide, Ms. Wade continued to be denied her medications as prescribed, was placed back in solitary confinement, and denied her medically necessary follow-up treatment.

Dkt. 60-2 at 22-23.  Defendant moves for summary judgment on all of Plaintiff's claims.

## II.    Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c). The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party. *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002).  The non-moving party who bears the burden of proof at trial must do more

than point to a metaphysical doubt about the material facts to overcome a motion for summary judgment. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The Court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *R.L. Inv. Prop., LLC v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013).

### III.   Section 1983 Analysis

#### A. Legal Standards

The following four subsections set forth the legal standards governing § 1983 claims by jail inmates asserting municipal liability for constitutional deprivations.   Additional legal standards are discussed later in connection with Plaintiff's specific claims.

##### 1.   Municipal Liability

Montgomery County is the only defendant in this case.  In order to establish *Monell* liability against a municipal entity under 42 U.S.C. § 1983, a plaintiff must show the entity had a policy or custom that was the "moving force" behind the violation of her constitutional rights. *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 691 (1978).  This means that to succeed on her claim against Montgomery County, Plaintiff must (a) identify a policymaker, (b) identify an official policy or custom, and (c) demonstrate that the official policy or custom was a moving force behind the violation of her constitutional rights. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). "The three attribution principles identified here—a policymaker, an official policy and the "moving force" of the policy—are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as

actions of the government itself." *Id.*   In this case, Sheriff Gage is a policy maker for Montgomery County and the Inmate Handbook represents official policy of the Montgomery County jail.[2]   Therefore, the ultimate summary judgment in this case is whether Plaintiff has met her burden to present sufficient evidence that an official policy of the Montgomery County jail was the moving force behind a violation of her constitutional rights.

## 2.  Pre-trial v. Post-Conviction § 1983 Legal Standards

The determination of whether Plaintiff's constitutional rights were violated requires a separate analysis of events before and after her conviction.   Plaintiff was arrested on April 8, 2015 and held as a pretrial detainee.   Dkt. 54-2 at 4, 18.   On May 22, 2015 she pled guilty to a misdemeanor drug charge, was sentenced to 90 days in jail, and was released on August 6, 2015.   Dkt. 50 at 38-39; Dkt. 66-1 at 71.   Plaintiff complains of conditions and events that occurred at the Montgomery County Jail while she was a pretrial detainee, as well as later while she was a convicted prisoner.   Whether an individual is detained prior to trial, or is confined to serve a sentence, the state is obligated to provide for basic human needs during the inmate's period of detention or confinement.   *Hare*, 74 F.3d at 644. However, the rights of pretrial detainees are measured by the due process requirements of the Fourteenth Amendment, while the rights of sentenced inmates are measured by the

---

[2] The Fifth Circuit has found that Texas police chiefs are final policymakers for their municipalities, and the issue is often not disputed.   *Garza*, 922 F.3d at 637. In *Gann v. Montgomery Cty.*, Case No. 4:14-cv-1575, 2016 WL 10807190 at *6 (S.D. Tex. 2016), Montgomery County conceded that Sheriff Gage was a final policymaker for Montgomery County under Texas law.   Counsel for Montgomery County confirmed at the hearing on September 4, 2019 that the Inmate Handbook is official Montgomery County Jail policy.   A transcript of the hearing is not currently available, but the recording reflects this position at approximately 10:21:11-10:23:05 a.m.   Future references to the hearing are noted as "Hr." followed by the time at which the referenced statement appears.

standards of the Eighth Amendment.  *Ybarra-Fuentes v. City of Rosenberg*, Civil Action No. H-18-1824, 2018 WL 6019177 at * 2 (S.D. Tex. Nov. 16, 2018) (citing *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000).  Thus, though the standards overlap in the sense that both the Fourteenth and Eighth Amendments protect an inmate's rights to medical care and protection, Plaintiff's claims as a pretrial detainee should be analyzed separately from her claims arising from her treatment as a sentenced inmate.  *See Baughman v. Hickman*, No. 17-20679, 2019 WL 3820065, at *2 (5th Cir. Aug. 15, 2019) (Noting that while "[t]he proper analysis of each category of claims is the same, [because] 'Fourteenth Amendment case law concerning pretrial detainees [is based on] the Supreme Court's Eight Amendment precedent concerning prisoners[,]" the court would analyze pretrial detainee's claims according to case law involving pretrial detainees.) (internal citations omitted).

### 3. Pretrial Detainee § 1983 Legal Standards: Episodic Acts or Omissions v. Conditions of Confinement

Whether Plaintiff's claims challenge "conditions of confinement" or "episodic acts or omissions" by a municipal or prison official affects the legal standards applicable to her claims as a pretrial detainee.  *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999) ("We begin by deciding whether to classify the "challenge as an attack on a 'condition of confinement' or as an 'episodic act or omission.'")).  The Fifth Circuit has made clear that a plaintiff challenging a municipality's failure to prevent a suicide attempt may assert either a "conditions of confinement" or an "episodic act or omission" claim, or both.  *Garza v. City*

*of Donna*, 922 F.3d 626, 633 n.3 (5th Cir. 2019) ("The district court did go a step beyond our precedent by asserting that our court 'uniformly' holds that jail-suicide cases are to be decided on an episodic-act basis.  In a recent case, we allowed that a jail suicide might give rise to a conditions theory." *Citing Sanchez v. Young Cty., Tex.*, 866 F.3d 274, 279 (5th Cir. 2017) ("plaintiffs can bring a pretrial detainee case, whether or not it ultimately involves suicide, under alternative theories of episodic acts and omissions by individual defendants or unconstitutional conditions of confinement.")); *Estate of Henson v. Wichita Cty. Tex.*, 795 F.3d 456, 464 (5th Cir. 2015) (there is no rule barring a plaintiff from pleading both conditions of confinement and episodic acts and omissions theories of his case and the court my properly evaluate both separately); *Gann*, 2016 WL 10807190 at *7-8 (recognizing both episodic acts and omissions and conditions of confinement theories in a jail suicide case).

The distinction between an "episodic act or omission" claim and a "condition of confinement," or jail conditions, claim is significant because "no mens rea is required to establish a [jail-conditions] claim." *Ybarra-Fuentes*, 2018 WL 6019177 at * 3; *Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009) (a plaintiff who has properly stated a conditions of confinement claim "is relieved from the burden of demonstrating a municipal entity's or individual jail official's actual intent . . ..").  The Supreme Court set the standard for evaluating whether a condition of confinement violates the Constitution in *Bell v. Wolfish*, 441 U.S. 520, 543 (1979).  Under *Bell*, a prison condition violates the Constitution only if it "is not reasonably related to a legitimate, non-punitive government objective." *Id.*; *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (citing *Bell*, 441 U.S. at 539 and *Hare*,

74 F.3d at 640).  In other words, if a Plaintiff can show that she was subjected to a condition of confinement that does not have a reasonable relationship to a non-punitive purpose, then she need not separately prove that the County maintained that condition with deliberate indifference.  *See Flores v. County of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997) (In condition of confinement cases, the municipality's promulgation and maintenance of the challenged conditions establishes the intent to cause the alleged constitutional violation).

In contrast, the *Bell* test has no place in the analysis of a claim based on the episodic act or omission of a state jail official.  *Hare,* 74 F.3d at 647-48.  To succeed in a case alleging an episodic act or omission, an inmate must establish that a jail official acted with subjective, deliberate indifference to Plaintiff's constitutional rights.  *Id.*; *Scott*, 114 F.3d at 54.  "A prison official acts with subjective deliberate indifference if (1) he knows that an inmate faces a substantial risk of serious bodily harm; and (2) he disregards that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).  Subjective deliberate indifference is an onerous standard and requires more than negligence or even gross negligence by prison officials.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  And, even if a plaintiff shows an individual acted with subjective deliberate indifference, in order to impose liability on a municipality for episodic acts and omissions, Plaintiff must also show the acts or omissions "resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [plaintiff]'s constitutional rights." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).

### 4.   Post-Conviction § 1983 Legal Standards: Deliberate Indifference

The episodic acts or omissions v. conditions of confinement framework and the *Bell*

test do not apply to claims asserting post-conviction violations of the Eighth Amendment,

which prohibits officials' deliberate indifference to a prisoner's serious medical needs.

*Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (Deliberate indifference to the medical

needs of prisoners, either by prison doctors or jail staff, is proscribed by the Eighth

Amendment.).  Because Plaintiff seeks to impose municipal liability on the County for her

post-conviction lack of medical care, she must show both that jail staff acted with

subjective deliberate indifference, and that her injury resulted from a County policy

maintained with objective deliberate indifference.  *Baughman v. Hickman*, No. 17-20679,

2019 WL 3820065, at *3 (5th Cir. Aug. 15, 2019) ("County as opposed to individual

liability has the additional requirement that the 'violation resulted from a [county] policy

or custom adopted and maintained with objective deliberate indifference.'" (citation

omitted)); *Lawson v. Dallas Cty.,* 286 F.3d 257, 263-64 (5th Cir. 2002); *Olabisiomotosho*

*v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).

### B.  Plaintiff's 42 U.S.C. § 1983 Pre-trial Detainee Claims

#### 1.  Plaintiff Is Not Asserting § 1983 Claims Based on Episodic Acts or Omissions

Defendant argues that Plaintiff has asserted *only* episodic act or omission claims,

which as discussed above require a showing of subjective deliberate indifference by an

individual actor that rises above mere medical negligence.[3]  Dkt. 50 at 20-22.  Because

---

[3] This argument goes hand-in-hand with Defendant's contention that its "policy of using a third-party company to

Plaintiff has not made a showing of subjective deliberate indifference, Defendant argues that it is entitled to summary judgment on Plaintiff's § 1983 claims in their entirety. However, because Plaintiff asserts conditions of confinement claims, the failure to present evidence of subjective deliberate indifference is not fatal to her claims.

Plaintiff's Second Amended Complaint expressly asserts only claims based on Plaintiff's conditions of confinement.  Dkt. 26 at 10 ("Montgomery County violated Plaintiff's constitutional right to receive adequate medical care as a condition-of-confinement"); *Id.* at 13 ("Montgomery County violated Plaintiff's constitutional right to be protected from suicidal action as a condition-of-confinement.").  She reiterated her intent to prosecute this action *only* as a § 1983 "conditions of confinement" case in her Motion for Summary Judgment (Dkt. 51-2), her Response to Defendant's Motion for Summary Judgment (Dkt. 60-2), and at the September 4, 2019 hearing.  *See* Hr. at 10:31:10-10:31:33 (arguing that it was Montgomery County's written policy that directly caused Plaintiff's injury).

Plaintiff's operative Complaint and briefing do include factual allegations of discrete acts or omissions by jail officials.  For example, Plaintiff alleges that Montgomery County jail staff ignored her pleas for medication; refused to administer her prescribed

---

provide medical services in a jail breaks any causal connection of liability between Plaintiff and Montgomery County." Dkt. 50 at 19; Hr. at 10:28:30-10:28:58, 11:11:17-11:12:54, 11:29:28-11:31:14. Montgomery County and the Montgomery County Sheriff's Office entered into an agreement effective June 1, 2013 with Correctional Healthcare Companies, Inc. (CHC) for CHC to prove medical services for all inmates and detainees at the Montgomery County Jail. Dkt. 50 at 95-128.  On March 24, 2015, only a couple weeks before Plaintiff's arrest, the parties amended the contract to include mental health care services. Dkt. 50 at 129-132. At the summary judgment hearing, counsel for Montgomery County confirmed that while the County delegated to CHC the authority to make medical decisions and policies, the Inmate Handbook is the official policy of the Montgomery County Jail. Hr. at 10:21:11-10:23:05 a.m. Because the Court finds that Plaintiff has asserted something other than medical negligence claims based on the acts or omissions of CHC, this argument fails. Hr. at 11:12:37-11:12:54.

medication; refused to allow her to eat; and refused her pain killers after jaw surgery.  Dkt.
26 at 5-7.  In her Summary Judgment Response Plaintiff states that individual officers did
not observe her on the day of her suicide attempt with the frequency required by official
jail policy.  *See* Dkt. 54 at 13-14.  She further alleges that Deputy Thierry ignored her pleas
for help on the day of her suicide attempt.  *Id.* at 14.  However, despite these accusations,
Plaintiff does not claim that any individual was deliberately indifferent to her needs.
Instead,  "Ms. Wade maintains that, while individual officers and medical personnel carried
out Montgomery County's policies, it was the policies, practices, customs, and procedures
that were the moving force behind her injury."  Dkt. 60-2 at n.43.  Plaintiff has not pled or
supported with evidence any theory of this case based on the episodic act or omission of
an individual.  As Defendant accurately points out in its motion, "Wade does not identify
any employee or agent of Montgomery County who acted with deliberate indifference to
her rights." Dkt. 50 at 18-19 (citing *Flores v. County of Hardeman, TX*, 124 F.3d 736, 739
(5th Cir. 1997).  To the extent Plaintiff asserts episodic act or omission claims, Defendant
would be entitled to summary judgment, but she repeatedly has alleged Constitutional
violations resulting from conditions of confinement.

## 2.  Plaintiff is Asserting § 1983 Claims Based on Conditions of Confinement

A "condition of confinement" claim attacks "general conditions, practices, rules,
and restrictions of pretrial confinement."  *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644
(5th Cir. 1996).  "A condition is usually the manifestation of an explicit policy or
restriction," but in some cases a condition may reflect a de facto policy as evidenced by a

pattern of conduct sufficiently extended or pervasive to prove an intended condition or practice. *Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009).

In *Gann*, the court recognized two conditions of confinement claims against Montgomery County:  (1) denial of access to mental health services for pretrial detainees; and (2) failure to train jail medics to adequately assess inmates' risk of suicide.  2016 WL 10807190 at 11.  In *Shepherd v. Dallas Cty.*, 591 F.3d 445, 453 (5th Cir. 2009), the Fifth Circuit held that the district court properly analyzed the plaintiff's challenge to the jail's allegedly inadequate system for providing medical care to inmates with chronic illness as a "conditions of confinement" claim.  Other conditions of confinement cases "have concerned durable restraints or impositions on inmates' lives like overcrowding, deprivation of phone or mail privileges, the use of disciplinary segregation, or excessive heat." *Garza*, 922 F.3d at 633-34.

In this case, Plaintiff has articulated four conditions of confinement she alleges violated her constitutional rights as a pretrial detainee entitled to receive medical care and protection from the risk of suicide:  (a) placing her in solitary confinement; (b) failing to train staff to adequately assess her risk of suicide; (c) providing access to bed sheets and tie-down points in the 24-hour cell; and (d) denying her mental health treatment and medication prior to her suicide attempt.  Using the legal standards explained above, the Court addresses whether Plaintiff's § 1983 claims based on those conditions survives the County's motion for summary judgment.

### a. Montgomery County's policy of placing a detainee identified as a suicide risk in a 24-hour observation cell is reasonably related to a legitimate governmental objective.

Plaintiff was placed in a "violent" cell for a few hours and then transferred to a 24-hour observation cell because jail staff identified her as a suicide risk. The 24-hour observations cell differs from an "administrative segregation" cell, which is used to house inmates separately from the general population as a punitive measure. Hr. at 11:20:03-11:21:34; *Gann*, 2016 WL 10807190, at *2 (describing 4 categories of detention cells at the Montgomery County Jail).  Under the facts of this case—which include that Plaintiff: was identified as suicidal at intake; was placed in a "violent cell" for only a very short period of time; was placed in a 24-hour cell for observation for 4 days prior to her suicide attempt; and agreed with medic's recommendation that she stay in a 24-hour cell until she received her medication—she cannot meet her burden to show that Montgomery County violated her constitutional rights by placing her in "solitary confinement."  Placing a suicidal inmate in a 24-hour cell facilitates the observation and protection of the inmate and therefore serves a legitimate governmental purpose. *See Gibson v. Hilton*, No. 1:15-CV-01230, 2016 WL 8488925, at *4 (W.D. La. Dec. 12, 2016), *report and recommendation adopted*, No. 1:15-CV-01230, 2017 WL 1017615 (W.D. La. Mar. 15, 2017) ("In the case at bar, . . . Gibson was held in isolation because he was both a suicide risk and an escape risk. Therefore, Defendants have demonstrated a non-punitive reason for keeping Gibson in isolation for 14 months."); *Gainey v. Hanson*, No. CIV.A. 10-0371, 2011 WL 3419634, at *2 (E.D. La. July 15, 2011), *report and recommendation adopted*, No. CIV.A. 10-0371, 2011 WL 3365054 (E.D. La. Aug. 4,

2011) (placing an inmate in segregation because the inmate is a high risk for suicide or escape does not violate the inmate's constitutional rights).

Because Montgomery County's policy of placing suicidal inmates in 24-hour cells is reasonably related to the goal of protecting a suicidal inmate, Plaintiff cannot meet her "burden to satisfy each element of a condition-of-confinement claim, including that the policy in question had no rational, non-punitive basis[.]"  *Garza v. City of Donna*, No. 7:16-CV-00558, 2017 WL 6498392, at *17 (S.D. Tex. Dec. 15, 2017), *aff'd on other grounds*, 922 F.3d 626 (5th Cir. 2019).  Defendant's motion for summary judgment on this condition should be granted.

>    ### b.  *Plaintiff cannot meet her burden to show Montgomery County had a policy of failing to train jail staff which created an unconstitutional condition of confinement.*

Plaintiff's Second Amended Complaint does not expressly include a claim against Montgomery County for failure to train jail staff.  *See* Dkt. 26.  However, in her Motion for Summary Judgment, Plaintiff argues that "Montgomery County did not train its employees how to identify and report when changes in an inmate's medicine rendered treatment ineffective or inadequate."  Dkt. 54 at 26.  In addition, in her Reply to Defendant's Motion for Summary Judgment, Plaintiff argues that at intake Deputy Derby, and not a "Facility Physician, Facility Medic, or the local MHMR representative" classified her suicide risk incorrectly and in violation of jail policy.  Dkt. 62 at 5.  Plaintiff argues that Derby's misunderstanding of Montgomery County's own policies, including the requirement that a suicidal inmate should be checked on every five minutes, demonstrates the need for more training.  Dkt. 62 at 5.  Finally, Plaintiff's counsel raised the issue of

Montgomery County's failure to train at the hearing.  Hr. at 11:33:04.

Assuming Plaintiff properly pleaded a failure to train claim, she has not met her burden to create a genuine issue of material fact as to such a claim.  Montgomery County's policy, as stated in its Mental Disabilities/Suicide Prevention Plan, is to train all staff on "procedures for recognition of mentally retarded, mentally ill and suicidal inmates."  Dkt. 50 at 138.  All new employees receive 8 hours of in-service training and intake officers receive 4 hours of "additional training relating to proper identification of mentally ill, mentally retarded and suicidal inmates."  *Id.*  Plaintiff has not shown that Montgomery County's training policy as set forth above resulted in any injury to her.  Plaintiff has not shown that Montgomery County has a de facto policy of not abiding by its written training policy.  She also has not shown that Montgomery County's training policy regarding how to handle suicidal inmates bears no reasonable relationship to a legitimate, non-punitive purpose.

This case differs from *Gann*, a case in which the intake officer noted the detainee's prior suicide attempt but did not identify him as suicidal.  2016 WL 10807190 at * 1.  Two days later, a jail medic performing a second suicide screening noted Gann's mental health history and recommended moving him to an administrative segregation cell, not because he was a suicide risk, but because "he does not do well around others."  *Id.* at *2.  The jail medic testified that she had not been trained to identify different levels of suicidal risk.  2016 WL 10807190 at * 11.  The evidence in *Gann* established that the jail medic received only one hour of formal training in suicide risk assessment during a ten-year career and denied receiving any training regarding increased risk of suicide for persons who did not

16

receive psychiatric medication.  *Id.* at *13.

In contrast to *Gann*, Plaintiff in this case was classified as a suicide risk by intake staff.  Plaintiff has presented no evidence regarding the amount of training in suicide risk assessment Deputy Derby or other jail staff received.  Plaintiff fails to explain what training Montgomery County should have provided to prevent Plaintiff's injury.  In sum, Plaintiff has not meet her burden to show that a condition, the failure to train jail staff, existed at the Montgomery County jail, or that the condition resulted in the deprivation of her constitutional rights.  Defendant's Motion for Summary Judgment should be granted on Plaintiff's § 1983 claim based on a failure to train jail staff.

### c. Plaintiff has met her burden as to § 1983 claims based on Montgomery County's policy of failing to provide mental health treatment and medication to suicidal inmates.

Plaintiff was booked into the Montgomery County Jail on April 8, 2015.  She promptly informed jail personnel during intake screening that she was suicidal and required psychiatric medications.  Dkt. 66-1 at 12.  Intake personnel requested her medical records and referred her to Tri-County for a MHMR referral.  Dkt. 66-1 at 6.  She completed a medical release form enabling jail medical staff to obtain medical records and confirm her prescriptions with her treating doctor.  Dkt. 54-2 at 41.  Plaintiff's physician, Dr. Rubashkin faxed her medical records to the jail on April 9, 0215, confirming that she was prescribed Seroquel, Cymbalta, Invega, Trazodone Hydrochloride, and Xanax.  Dkt. 66-1 at 10. There is some dispute about whether Plaintiff's boyfriend delivered her medications to the jail, but it is undisputed that they were never given to her.  Dkt. 54-4 at 169-70; Hr. at 10:20:04.

A Tri-County medic, John Jay Conley, met with Plaintiff on April 10, 2019.  He

noted her prescriptions for psychiatric medications and recommended that she remain in 24-hour observation.  Dkt. 54-2 at 86.  As a medic, Conley did not have authority to approve administration of the medications.  Although jail records do not reflect the reason for the failure, it is undisputed that Dr. Ahmed did not approve distribution of her prescribed medications prior to her suicide attempt.  It is also undisputed that Plaintiff did not see a physician between the time of her arrest on April 8, 2015 and her suicide attempt on April 13, 2015 and did not receive any medications during that period.  Hr. at 10:23:05-10:23:44.

Again, there is no dispute that the Montgomery County Jail Inmate Handbook reflects County policy.  The Handbook states:

> ***Mental Health Service is limited to Crisis Intervention Evaluation and continuance of mental health medications as prescribed by mental health professionals outside of this facility.***  Confirmation of treatment in a mental health facility or program is required for starting any mental health medications and is obtained through completion of a medical release of information form signed by the individual. Routine medical requests are handled through submission of a written request detailing the medical need or services requested.  All routine requests for medical services are processed daily by the medical staff.  Medical request for a physical assessment or consultation are observed in sick call on a daily basis.  Complaints not requiring an assessment will be processed administratively and a written response returned to the inmate detailing the action taken in the matter.  All routine requests will be resolved as soon as possible.
>
> In case of a medical emergency, you should notify the housing officer immediately.  If deemed necessary, you will be escorted to the Infirmary for observation and/or treatment.  If the complaint is not deemed an emergency, the individual will be instructed to complete a written request from the Infirmary for treatment.
>
> ***The Montgomery County Jail does not prescribe or administer narcotic medication***, birth control, or sleeping aids to inmates confined within this facility ***except as approved by the Jail Doctor.***

18

> This facility passes medication during scheduled time during the day. Prescription medications are administered on a schedule as ordered by the Jail Doctor.  Inmates may be allowed to keep medications on their person (KOP).  This is a privilege and may be revoked should the inmate not comply with the rules related to KOP medication.
>
> Through the use of a contract pharmacy service, most medications prescribed by the Jail Medical Director are received within 24-48 hours after they are ordered.  ***No medication is provided to an inmate without the approval of the [J]ail Doctor.***  Inmates may have medications prescribed by their primary care physician delivered to the jail for dispensing.  These medications will be logged and administered at the scheduled medication pass times.  Such prescription medications must be delivered in the pharmacy container with the prescription label attached and must bear a current prescription date. Medication delivered to the jail that does not conform to established standards will not be accepted or will be sealed in a locked drug cabinet pending the inmates release from this facility.  Non-prescription medication will not be accepted or distributed within this jail facility.  However, you can purchase certain [n]on-prescription medications through commissary.

Dkt. 54-2 at 26 (emphasis added).  The Handbook does not set a timeline for how quickly a Jail Doctor must see a suicidal inmate or how quickly a Jail doctor must confirm and approve the administration of prescriptions from an outside provider.  *See* Hr. at 10:22:35-10:23:24, 10:32:39-10:33:28 (confirming no written policy as to time-frame for seeing a physician).  Plaintiff contends that these Montgomery County policies resulted in the delay of needed mental health treatment, increasing her risk of suicide, in violation of her constitutional rights.

In *Gann* the plaintiff did not receive any mental health services in the two weeks before his suicide attempt even though jail personnel knew that he had been diagnosed with several mental illnesses, was not taking his prescribed medication, and had previously attempted suicide.  2016 WL 10807190 at * 12.  The *Gann* court concluded that these facts

created "a genuine issue of material fact about whether Montgomery County had a policy that unconstitutionally denied Plaintiff's mental health treatment." *Id.* Similarly, in this case a reasonable jury could conclude that Montgomery County's policies regarding the dispensing of medication and mental health treatment denied Plaintiff her constitutional right to mental health care while in the custody of the Montgomery County Jail. Therefore, Defendant's motion for summary judgment should be denied with respect to Plaintiff's § 1983 claims based on the failure to provide mental health care and medications.

### d. Plaintiff has met her burden as to her § 1983 claim based on conditions in the 24-hour cell.

According to Montgomery County's designated 30(b)(6) witness, "there have been a lot of [suicide] attempts" in Montgomery County jail. Dkt. 54-2 at 80. Many of those attempts involved hanging by a bed sheet. *Id.* at 81. For example, Rickey Cleon Gann attempted to hang himself with a bed sheet in an administrative segregation cell in 2012. 2016 WL 10807190 at *1. Mitchell James Bryon killed himself with bed sheets at the jail in 2007, and Early Handy did the same in 2010. *Id.* at 12.

In 2017, at least in part to help prevent hangings, the jail began using mattress covers shaped like a large bag made out of thicker material than sheets. Dkt. 54-2 at 82. That had been the policy prior to 2007 as well, but it changed at some point prior to Plaintiff's incarceration. *Id.* at 82. In addition, the jail removed all bunk handles from every cell in the facility at some point after Plaintiff's suicide attempt. *Id.* at 83.

Plaintiff has established that at the time of her suicide attempt it was Montgomery County policy to provide regular bed sheets and bunks with handles that could be used as

tie-down points in 24-hour observation cells.  There is at least a fact issue as to whether Montgomery County had a legitimate, non-punitive rationale for providing a regular bed sheet and a tie down point in 24-hour cells despite knowing that this condition provided inmates with the means to hang themselves.  The Court concludes that Defendant's Motion for Summary Judgment should be denied as to Plaintiff's § 1983 claim based on the bed-sheet and tie-down point in the 24-hour cell.

### C.  Plaintiff's 42 U.S.C. § 1983 Post-Conviction Claims

As noted in the legal standards section, the Eighth Amendment ensures an inmate's right to receive care for serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  "The Fifth Circuit has defined a 'serious medical need' as 'one for which treatment has been recommended or for which the need is so apparent that *even a layman* would recognize that care is required.'"  *Murrell v. Zeon*, No. CV H-18-2626, 2019 WL 2343398, at *4 (S.D. Tex. June 3, 2019) (emphasis in original) (quoting *Gobert v. Caldwell,* 463 F.3d 339, 345 n.12 (5th Cir. 2006)).  However, a prisoner is not entitled to relief under § 1983 when the provision or absence of health care is merely negligent or even grossly negligent. *Brown v. Callahan,* 623 F.3d 249, 255 (5th Cir. 2010); *Mendoza v. Lynaugh,* 989 F.2d 191, 193 (5th Cir. 1993).

The record in this case establishes that Plaintiff had a serious medical need to have the wires that Dr. Bailey inserted in her mouth in April 2015 surgically removed in a timely manner.  Jail records show that Dr. Bailey recommended that the wires be removed from her mouth in early June 2015.  Plaintiff filed multiple grievances in July 2015 complaining, among other things, about the wires not having been removed and causing problems in her

mouth.  On July 30 2015, Linda Osborne rejected the grievances as unfounded because Plaintiff had been given mouthwash to treat her gingivitis, and further because "As for the Dr. Baily [sic], it is the policy of the jail that if you don't qualify for public assistance you must pay for your care outside the facility yourself."  Dkt. 54-3 at 46.  Osborne also informed Plaintiff on July 30 that "an appointment is being made to have the wire out. We are not at liberty to give you that date."  Dkt. 54-3 at 55.  Dr. Bailey finally removed the wires, apparently at Montgomery County expense, on August 5, 2015, approximately 8 weeks later than recommended.  Dkt. 54-3 at 36 ("she is due to have wires removed the week of June 8, 2015."); Dkt. 54-3 at 98 (showing admission to Conroe Medical Center on 08/05/15); Dkt. 50 at 14.

> The Montgomery County Inmate Handbook provides:
>
> As per the Texas Code of Criminal Procedure, inmates are required to reimburse Montgomery County for medical, dental, and mental health services provide to them.  If an inmate has money in his/her account, it will be used to pay the medical expenses as long as there is an outstanding balance on the medical bill.  The Inmate Trust Fund System continuously tracks charges.  This account is renewed each time the individual returns to the Montgomery County Jail, and any balances owed will be deducted from available funds in the account until it is paid.  Inmates returned to Montgomery County on a bench warrant from TDCJ-JD or other County Jails for a Montgomery County charge will be required to pay for their medical related expenses.

Dkt. 54-2 at 27.  The Hospital District Health Care Program notified Plaintiff on May 20, 2015 that she was ineligible for medical services because "No Medical Need – Not a Covered Service."  Dkt. 66-1 at 45.  Osborne's response to Plaintiff's grievance could be interpreted to mean Montgomery County expected payment from her in advance of offering her medical services.  In addition, there is evidence that Dr. Bailey refused to see

Plaintiff because Montgomery County had not paid his other outstanding bills.  Dkt. 54-2 at 80; Hr. at 11:02:42-11:05:23 (discussing Montgomery County policies for payment of outside medical providers.).   Plaintiff's evidence creates a fact issue as to whether Montgomery County maintained a policy requiring payment to outside medical providers that resulted in the denial or delay of needed medical care to inmates like Plaintiff.

The County argues it cannot be found to have maintained a policy of denying medical care to inmates because it was entitled to rely on the expertise of its third-party medical contractors.  *See* Dkt. 50 at 19 (citing, *e.g.*, *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011)).  This case presents the inverse scenario.  Montgomery County did not rely on the expertise of its third-party medical providers in denying Plaintiff treatment.  Instead, a reasonable jury could conclude that jail officials *ignored* the advice of third-party medical providers due to Montgomery County's policies regarding payments for services.  *See Baughman v. Hickman*, No. 17-20679, 2019 WL 3820065, at *2 (5th Cir. Aug. 15, 2019) (Plaintiff can show deliberate indifference by showing that jail officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." (citation omitted)); *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  Plaintiff was evaluated at Conroe Medical Center on May 31, 2015 and directed to follow up with Dr. Bailey in two weeks.  Dkt. 54-3 at 38.  Her wires were not removed until August 5, 2015.  This delay occurred despite the fact that Plaintiff's medical records stated the need for treatment and she repeatedly complained about problems from the continued presence of the wires.  Defendant's motion for summary judgment on Plaintiff's

post-conviction § 1983 claim based on the denial of needed medical care following her jaw surgery should be denied.[4]

### IV.   Analysis of ADA/RA Claims

### A.  Legal Standards

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA applies to state prisons and the provision of medical services in those prisons. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (noting that "modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and which disabled prisoners could be excluded from)").  Title II authorizes suits by private citizens for money damages against public entities that violate § 12132.  *See* 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794(a)).

Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to

---

[4] Plaintiff also contends that post-surgery she was denied pain and psychiatric medication, as well as liquid meal replacements, despite prescriptions for them.  Dkt. 54 at 15-16; Hr. at 10:35:42-10:37, 10:39:19-10:39:50.  The record reflects that Dr. Ahmed approved pain and psychiatric medications upon Plaintiff's return to the jail from the hospital.  Dkt. 66-1 at 21-32.  At the hearing, counsel argued that despite the prescriptions, the medications "just weren't given."  Hr. at 11:10:10.  Assuming there is a fact issue as to whether Plaintiff received medication and liquid meals post-surgery, she has not identified a Montgomery County policy that was the motivating force behind that deprivation.

discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).  "The [Rehabilitation Act] and the ADA are judged under the same legal standards, and the same remedies are available under both Acts."  *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010).  In order to succeed on a claim under either Act, a plaintiff must show that (1) she has a qualifying disability; (2) she has been denied the benefits of services, programs, or activities for which the public entity is responsible, or was otherwise discriminated against by the public entity; and (3) she was discriminated against by reason of her disability.  *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

The predicate question in any Title II claim is whether the claimant is a "qualified individual with a disability," as defined by the ADA. *See* 42 U.S.C. § 12131(2).  The term "disability" under the ADA means: "(A) a physical impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(ii).   Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Hale*, 642 F.3d at 500 (citing 29 C.F.R. § 1630.2(i)).  Sleeping is also a major life activity.  42 U.S.C. § 12102.

### B.  Plaintiff has Presented Evidence of a Qualifying Disability.

The record indicates that Plaintiff has a life-long history of mental illness. Dkt. 54-2 at 12, 15, 41, 43, 47, 143-52.  Mental illness can be a qualified disability under the ADA. *See Stradley v. Lafourche Commc'ns, Inc.*, 869 F. Supp. 442, 443 (E.D. La. 1994) ("Depression and other mental illnesses can qualify as disabilities for purposes of the

ADA.").  However, the diagnosis of a condition is not enough to satisfy the legal standard for disability under the ADA or Rehabilitation Act—Plaintiff must present evidence of a substantial limitation on a major life activity.  "Neither the Supreme Court nor [the Fifth Circuit] has recognized the concept of a per se disability under the ADA, no matter how serious the impairment; the plaintiff still must adduce evidence of an impairment that has actually and substantially limited the major life activity on which he relies." *Waldrip v. General Electric Co.*, 325 F.3d 652, 656 (5th Cir. 2003).

Here, Plaintiff has presented evidence that she receives disability payments from the government because her mental illness renders her unable to work.  Dkt. 54-2 at 143.  Her qualification for government disability is some evidence of her work limitation because her condition is not temporary and it prevents her from working a wide range of jobs.  *Cf. Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1051 (5th Cir. 1998) (temporary work impairments are not qualifying disabilities.); *Dupre v. Harris Cty. Hosp. Dist.* 8 F. Supp. 2d 908, 918 (S.D. Tex. 1998) (bipolar disorder did not substantially limit plaintiff's activity of working where the evidence showed it only restricted her performance of one job.).  Plaintiff has met her summary judgment burden and created a fact issue on the question of whether she has a qualified disability.

### C. Plaintiff Cannot Demonstrate Discrimination on the Basis of a Qualified Disability as Required by the ADA

"The ADA is not violated by 'a prison's simply failing to attend to the medical needs of its disabled prisoners.'" *Nottingham v. Richardson*, 499 F. App'x 368, 376 (5th Cir. 2012) (quoting *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).  Instead, Plaintiff must

show she was treated differently because of her qualified disability.  *Id.*  In order to recovery compensatory damages under the ADA and Rehabilitation Act, Plaintiff must show intentional discrimination.  *Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002).

Plaintiff's Second Amended Complaint lists the following general ways in which she allegedly was denied access to benefits and services due to her mental disability:

> a. excluding Plaintiff from participation in benefits and services provided to the other inmates by not accommodating her mental disability;
> b. denying Plaintiff the benefits and services provided to the other inmates because of her mental disability;
> c. subjecting Plaintiff to discrimination in the benefits and services provided to the other inmates because of her mental disability;
> d. refusing to have a reasonable system in place which could assess her mental health/medical needs;
> e. refusing to provide her with reasonable accommodations for her mental health/medical needs;
> f. refusing to and inadequately responding to at least eighteen forms complaining of inadequate medical care; and,
> g. having an institutional culture which was so mismanaged and overwhelmed by the mental health needs of the population at the Montgomery County Jail that it could not adequately assess (much less treat and accommodate) Plaintiff's mental health/medical needs.

Dkt. 26 at ¶¶ 143, 161.  In addition, Plaintiff contends in her summary judgment "she was placed in solitary confinement and was denied her medications as a reasonable accommodation because of her mental health disabilities."  Dkt. 54 at 29.  She further claims discrimination by "denial of recreational time, a shower, pen and paper, and the basic necessities for basic hygiene, including a toilet for two days."  Dkt. 60-2 at 27**.**

Plaintiff's alleged disability is mental illness.  While her suicide attempt at the Montgomery County Jail in April 2015 surely was related to her mental illness, her suicidal

ideation was a temporary condition.  All of Plaintiff's allegations about the way she was treated at the jail are based on her status as a suicide risk, not due to her mental health impairment itself.  The Court is not persuaded by counsel's argument at the hearing that the "totality of the circumstances" in this case satisfies the requirement to show a connection between the deprivations she alleges and her disability.  Plaintiff has presented no legal authorities in support of this theory of her case.  If adopted, Plaintiff's theory essentially would impose ADA and RA liability in every case in which an inmate was segregated due to suicide risk resulting from mental illness.  The law in the Fifth Circuit, as set forth in *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011), does not create liability under the ADA or Rehabilitation Act when an inmate is deprived of services or programs as a result of segregation imposed to address suicide risk.  Plaintiff's ADA and Rehabilitation Act claims should be dismissed.

## V.       Objections to Summary Judgment Evidence

Defendant objects to Plaintiff's Exhibits ZZ through EEE, HHH, and III (attached to her Motion for Summary Judgment), and to Exhibits F, I, J, and L (attached to her Summary Judgment Response). Defendant argues these Exhibits were not previously produced, are unauthenticated, are hearsay, and/or are not relevant.  *See* Dkt. 59 at 1-4; Dkt. 64 at 1-5.  The Exhibits to which Defendant objects are not necessary to the Court's analysis nor did the Court rely on them for any part of this recommendation.  If this Memorandum and Recommendation is adopted by the district judge, the district judge will rule on evidentiary objections at the time of trial.

For the limited purposes of this summary judgment record, the Court notes the

following:

- The testimony of Defendant's Rule 30(b)(6) witness, Jeremiah Richards, regarding suicide attempts by other inmates at the Montgomery County Jail is properly before the Court with respect to the summary judgment.

- Exhibit DDD, which relates to the suicide of Rickey Cleon Gann, Jr. which was at issue in *Gann v. Montgomery Cty.*, Case No. 4:14-cv-1575, 2016 WL 10807190 (S.D. Tex. 2016), bears Bates Number MOCO0008446, indicating it was produced by Defendant in this litigation.  Defendant's objection to DDD is overruled for purposes of the summary judgment motion.

- Defendant's remaining objections are sustained for purposes of the summary judgment motion only.

Plaintiff objects to Defendant's submission of the report of Dr. Joseph Penn on grounds that it was not timely produced. Dkt.50 at 180-99; Dkt. 60-2 at 9.  Defendant claims to have timely designated Dr. Penn as an expert on October 31, 2018 and that its designation identified his opinions as required by Federal Rule of Civil Procedure 26(A)(2). Dkt. 64 at 5.  Defendant represented at the hearing that Penn's expert report was created for purposes of summary judgment, not before, and Plaintiff was provided a copy of the report shortly before filing of Defendant's summary judgment motion.  Hr. at 10:45:45-10:48:30.  Because Dr. Penn will presumably be available to testify at trial, and Plaintiff should have been aware of the subject matter of Penn's testimony as early as October 31, 2018, the Court overrules Plaintiff's objection.  Nonetheless, the citations to Dr. Penn's report in Defendant's Summary Judgment Motion (Dkt. 50 at 4, 6, 10 n.6, 11 n.7) were not relied on when making the Court's recommendation.

## VI.    Conclusion and Recommendation

For the reasons discussed above, the Court recommends that Plaintiff's Motion for

Summary Judgment be denied, and Defendant's Motion for Summary Judgment be granted in part and denied in part as specifically set forth above.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

Signed on September 30, 2019, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge